Simrall's Heirs *vs.* Jacob's Ex'ors &c.

ERROR TO THE LOUISVILLE CHANCERY COURT.

> Where land was decreed to be sold, or so much thereof as would
> satisfy a lien, and by an arrangement between defendants' agent
> and a third person it was agreed that the third person would
> bid the amount of the lien for the whole lot of land, and pay a
> specific sum to the defendants for the whole, and the commis-
> sioner made the sale without any knowledge of the agreement,
> or any fraud in the purchaser, and the land was bid off by the
> person who had agreed to buy at the amount of the decree, and
> the sale was reported, confirmed, and the land conveyed, and the
> excess of price agreed on above the lien paid to defendants.
> Held, that there was nothing unfair or improper in the arrange-
> ment, and it was valid, and should not be disturbed after a
> lapse of 20 years and more.

In the year 1818 the heirs of W. F. Simrall insti-
tuted a suit in chancery, in the Jefferson circuit court,
against James Hunter, &c., to compel a conveyance
of twenty and a half acres of land then adjacent to,
but now within the limits of the city of Louisville.
In the progress of the suit it was found that the an-
cestor of complainants still owed to Hunter a balance
of the purchase money, and a decree was rendered
in the case, and decreeing a sale of so much of the
lot as would pay the sum remaining due of the pur-
chase money, and a commissioner appointed to make
the sale upon the failure of Simrall's heirs to pay the
balance due for the lot by a given day, with interest.
That decree was affirmed by the court of appeals;
and upon the return of the case to the Jefferson cir-
cuit court another day was fixed for the payment of
the money due in October, 1824.

The money not being paid the commissioner, under
this decree, on the 10th day of February, 1825, made
sale of the whole lot of twenty and a half acres for
the sum of $457 40½, being the amount of the sum
required to be raised by the decree. On the next day
the commissioner made a report of what he had done,
in advertising the time and place of sale, the course
pursued in making the sale, and on the same day the

court made an order approving and confirming the report of sale, which was made to J. I. Jacob, and giving day to the heirs of Simrall and others to convey to him the twenty and a half acres of land sold by the commissioner, and on their failing to do so authorizing and directing the commissioner to convey and report, &c.

The heirs of Simrall failing to convey, the commissioner executed to Jacob a deed of conveyance, reported and acknowledged the same in court a deed from the heirs of Simrall, Hunter, Breckinridge, Miller, and Cochran, to Jacob for the twenty and a half acre lot; and in April, 1825, this deed was approved, confirmed, and ordered to record. Jacob took possession in February, 1825, and has held it ever since.

This suit was brought by the heirs of Simrall in March, 1852, to set aside the sale made by the commissioner; charging fraud on the part of Jacob, the commissioner, and Bainbridge, the agent of the Simralls, and praying that the land be restored to them upon their paying to Jacob the sum paid by him for the land, with interest, and upon equitable terms.

Jacob answered the bill, and denies a part of the allegations positively, and as to others says he does not recollect the facts to have taken place as charged, or of making any agreement or arrangement with any friend of the Simralls; although if it hadoccurred, he believes he should have remembered it, and demands proof.

The facts are in substance the following: That before the sale by the commissioner in 1825, E. T. Bainbridge, as the agent and friend of the mother of complainants, she being their guardian, apprehending a sacrifice of the land if sold at public sale, without some previous arrangement in seeking a purchaser, applied to several persons to buy it at a fair price, and amongst others to J. I. Jacob. That Jacob agreed that he would give $1,000 for the whole lot if he could by it at the commissioner's sale for the amount due upon the decree. After consulting Mrs. Simrall,

SIMRALL'S HEIRS *vs.* JACOB'S EXS. &c.

Bainbridge agreed to make that arrangement, believing it, as he says, to be the best that could be done under the circumstances. The sale was advertised, but did not take place at the appointed time, and Jacob then declined to carry it out, but proposed to give $800 instead of $1,000 if he could get the whole lot. To this proposition Bainbridge agreed in consequence of the great scarcity of money, and being satisfied he could not do better. The sale was again advertised and made by the commissioner, under the decree, and Jacob was the purchaser, being the highest bidder at the sum required to be raised by the decree; satisfied the decree and paid the balance of the $800 to Mrs. Simrall.

The commissioner reports that he made the sale according to the directions of the decree, and that the amount of the decree was all he could get for the land, and that Jacob was the highest and best bidder at the sale. The bill of Simrall's heirs being dismissed on final hearing, they have brought the case to this court for revision.

STEWART, RIPLEY and LOGAN, for plaintiffs—

Insist, that there is no legal mode of divesting infants of their real estate, except under the sanction of a judicial proceeding, in a court of competent jurisdiction, and then only when it appears to be for the benefit of the infant.

They argue that the sale of the lot of twenty and a half acres of land was fraudulently made, and that Jacob, the purchaser, the commissioner who made the sale, and the agent of Mrs. Simrall participated in bringing about a ruinous sacrifice of the property of Simrall's heirs.

That the sale made by the commissioner was a fraudulent sale, and its true character concealed from the chancellor who, in ignorance thereof, gave it his sanction. The commissioner's knowledge of the fraudulent arrangement, is not essential to make out the case a fraudulent case on the part of Jacob.

That time presents no bar to the relief sought, as time only begins to run against relief against fraud from the time of the discovery of the fraud. Simrall's heirs hold as joint tenants, and the statute has never commenced to run—*Wilson v. Wilson's heirs,* 9 *B. Monroe,* 274. The allegation that they brought suit as soon as informed of their rights, which is not denied by Jacob, and is therefore to be taken as admitted.

That the court are bound to take for true the allegations of the bill in respect to the recent discovery of the fraud, because the allegation is not denied. 2 *Daniel's Chy. Prac.,* 736; *Goodrich v. Pendleton,* 2 *John. Chy. R.* 384; *Whaley v. Whaley,* 3 *Bligh,* 12; *Blannerhasset v. Day,* 2 *Ball & Beaty,* 118.

STEWART, CATES & REED, on the same side—

Make the following points:

1. That the complainants are not prejudiced by the contract with J. B. Stewart, Esq., who, as their attorney in this suit, is to have a compensation equal to one-fourth of the recovery.

2. That the statute of limitation presents no bar, nor does lapse of time.

3. That if lapse of time and champarty present no bar, has the complainants made out a proper case for relief? And it is argued that they have.

And, 1. It is argued that the sale by the commissioners to Jacob is void, and passed no title.

2. That the report of sale as to Jacob was false and inoperative.

3. The land in contemplation of law, as to Jacob, remains where it was at the time of the decree of sale, and he being a party to the fraud, is bound for the value of the land sold by him to others.

4. The heirs of Simrall being infants, had no power themselves, or through an agent by their guardian, to make a sale of their real estate. 1 *Story's Eq., sec.* 421; *Fonb. Eq., b.* 1, *chap.* 2; 3 *Burr.* 1801; *Ib.* 1794; 1 *Story's Eq. sec.* 241; 9 *B. Monroe,* 274.

SIMRALL'S HEIRS
*vs.*
JACOB'S EXS. &c.

C. S. MOREHEAD, SPEED and WORTHINGTON, on the same side—

1. By the arrangement made and carried out between Bainbridge and Jacob, the record is made to speak falsely, and thereby carry out a purpose for the benefit of Jacob, and he should be required to surrender any advantage thus acquired. See *Pasley and brothers v. Freeman*, 3 Term Rep., 51; *Wilson v. Wilson's heirs*, 9 B. Monroe, 274.

2. Lapse of time presents no objection to the relief sought. There was no fact calculated to excite suspicion, and the fraud but recently discovered. See *Breckinridge, &c., v. Churchill*, 3 J. J. Marshall, 15.

3. The fact that the fraud was recently discovered is not denied by Jacob, and is therefore to be taken as true according to the rule as established by the Code, whether it is alleged or to be presumed that the fact was known to him or not. (*Code Practice, sec.* 157 *and* 179.

4. The charge of champarty is not sustained. See *Brown v. Beauchamp*, 5 *Monroe*, 416; *Wilhite v. Roberts*, 4 *Monroe*, 174; *Ramsey v. Trent*, 10 B. *Monroe*, 336. The contract for fee may be measured by the extent of recovery—maintenance is the general term—champarty a species. See *Bacon's Ab., Tit. Maintenance.*

5. This is a suit based upon a fraud—it is not a bill of review. *Daniel's Chy. Prac.*, vol, 3, 1724, 1734. *Story on Pleading, sec.* 426.

NICHOLAS and TYLER, for defendants—

This is an original bill, in the nature of a bill of review, to set aside a decree for fraud in obtaining it. (8 B. *Monroe*, 343.) The prayer is that the decree confirming the report and commissioner's deed be set aside as fraudulently procured, and the sale as illegal.

The plaintiffs must fail if the charge is not sustained by proof; such is the general rule in all cases as to allegation and proof. For special reasons it must

be applied here, and complainants confined to that charge.

1. If there is no fraud, but mere irregularity in procuring the decree, then the proceeding should have been by bill of review proper, for newly discovered evidence, which can only be filed by leave of the court.

2. *Farraly v. Hobson*, 2 *Eng. Chy. Rep.*, 255; *Glaseat v. Lang*, *Ib.* 310; *Price v. Berrington*, 2 *Eng. Law, and Eq. R.*, 260, decide that when the bill sets up a case of actual fraud, and makes that the ground of relief, that plaintiff is not entitled to a decree by establishing some one or more of the facts, quite independent of the fraud, but which might create a case under a totally distict head of equity from that applicable to the case of fraud originally stated. This rule is adopted in a most signal manner by the supreme court of Rhode Island. *Mount Vernon Bank v. Stone*, 2 *R. I. R.*, 129; *Law Magazine for April*, 1853. No fraud is proved in this case, but distinctly disproved by plaintiffs witnesses.

3. There was no irregularity or informality in conducting the sale. If there had been any, still the motive would have been the controlling circumstance in giving character to the transaction. In *Webber v. Cox*, 6 *Monroe*, 110, the court said, "yet the sheriff and purchaser may have had no corrupt motives, and if they did not intend a fraud the sale was valid, for that is the criterion." The purchaser may be apprised that the officer has not done his duty properly, yet if he purchased without turpitude of motive the sale will be valid—*Hite v. Thomas*, 5 *B. Monroe*, 590. Fraud will never be presumed—*Gregg v. Sayre*, 8 *Pet.*, 240.

4. Limitation bars the suit in two ways—First, the three years limitation of a writ of error. Second, twenty years limitation. A bill of review is barred by the same time that bars a writ of error. *Story's Eq. Juris.*, page 326, sec. 410; *Ib.*, sec. 419; *Thomas v. Harvie*, 10 *Wheat.*, 441.

SIMRALL'S HEIRS
vs.
JACOB'S EXS. &c.

5. It is not allowable for parties and privies to allege any thing against decrees, in a collateral proceeding—*Gates v. Bustard*, 4 *Dana*, 441. In any proceeding, the effect of which is to overhaul a decree, the three years limitation applies—*Wilson v. Wilson*, 9 *B. Monroe*, 10.

6. The bar of twenty years is complete. Infancy was the only disability existing when the transaction occurred; it expired 14th May, 1831; add three years and it brings 14th May, 1834, more than seventeen years before suit. There is no lapping of disabilities. A party is not allowed the period of disability, and twenty years in addition, but only the one most to his advantage. The disability may last longer, but if it expires within the twenty years the bar is complete.

The denial of Jacob in his answer is sufficiently full to throw complaints upon the proof of their allegations of the time of their information of the facts, as well as every other essential allegation. The Code of Practice introduces no change in the practice on this point—it is but an adoption of the pre-existing rule of pleading. *Mitford*, 246-7; *Woods v. Moore*, 1 *John's Chy. R.*, 105. The second clause of sec. 151 does not, as contended by counsel, burthen every denial with the additional declaration of want "of any knowledge or information thereof sufficient to form a belief," but is a new mode of denial allowed by the Code in lieu of an express denial—so ruled in New York, *Vansantford's Pleading*, 247-8. The clause of sec. 179 which says every material allegation not expressly controverted must be taken as true, introduces nothing new in chancery pleading—such has always been the rule; an informal traverse or denial is therefore a specific controverting of the allegations.

If a complainant wishes to avail himself of any defect of form, justice requires that he shall be compelled to take it as the hearing. "A Code, the main object of which was to do away with danger to liti-

gants from the snares and entanglements of special pleading, would be illy construed in allowing such a pitfall as is contended for."

Chief Justice HISE delivered the opinion of the court.

In May, 1818, the heirs of William F. Simrall instituted their suit in chancery in the Jefferson circuit court, against James Hunter and others, to procure a conveyance of the legal title to about twenty and a half acres of land situated in the vicinity of Louisville. In the progress of this suit it was ascertained that a balance of the price, which the ancestor of the complainants owed to Hunter for the land, remained unpaid; and in January, 1823, a decree was made directing Hunter to convey the land by a given day to the complainants, upon their paying the residue of the price still due, to-wit: the sum of $265 69, with interest from the 1st May, 1814. If the complainants failed to make the payment on the day named, Samuel Dickerson was appointed as the court's commissioner, with authority and direction to sell so much of the land as might be necessary to pay the sum due to Hunter. Hunter appealed to this court, and the decree of the circuit court was affirmed. Upon return of the cause to the circuit court, the complainants having failed to pay the sum due upon another day given, under an order of the court made 25th October, 1824, Dickerson, the commissioner, on the 10th February, 1825, made sale of the whole of the land for the sum of $457 40½, the debt, interest and costs due, to John I. Jacob, as the highest and best bidder.

The commissioner, on the 11th February, 1825, made a minute and special report of his course and conduct in advertising the time and place of sale, and the mode pursued in making it, and on the same day the circuit court makes an order approving the report of the commissioner, and confirming the sale to J. I. Jacob, and also giving day to Hunter, and the heirs of Simrall, and others, to make a coveyance of the twenty and a half acres of land to the purchaser, Jacob,

SIMRALL'S HEIRS
*vs.*
JACOB'S EXS. &C.

and on their failure to do so, authorizing Dickerson, the commissioner, to convey to Jacob, and report, &c. The parties directed so to do, having failed to convey the land to Jacob by the day given, the commissioner executed, reported, and acknowledged in open court a deed from Hunter, Breckinridge, Miller, Cochran and the heirs of Simrall, to J. I. Jacob for the twenty and a half acres of land, and the same was in April, 1825, approved, confirmed, and ordered to be recorded by the court, which was done. This land went into the possession of Jacob, after his purchase in February, 1825, and has so continued ever since. When, after the lapse of about twenty-seven years, the heirs of Simrall bring this suit in chancery against Jacob, on the 6th of March 1852, and upon certain charges of fraud and unfairness imputed to Jacob, the commissioner, and an agent of the wife of Simrall, demand that the commissioner's sale and conveyance to Jacob shall be annulled, and that the land be restored to them upon their re-payment to Jacob of the sum paid by him for it to the commissioner, or which was realized from the sale, and applied to the payment of the balance of purchase money due to Hunter, with interest thereon, or upon just and equitable terms. Jacob answers, and either denies positively complainants allegations, or states that he does not recollect the facts to have taken place as charged, although, if they had occurred, he believes he would have remembered them, and therefore denies them, and demands proof of the charges as made.

The state of fact collected from the pleadings and proof, upon which complainants must succeed or fail in their demand, is precisely as follows, to-wit: Before the sale took place in 1825, E. T. Bainbridge, as the agent and friend of complainants' mother and guardian, and apprehending a sacrifice of the land should it be sold by the commissioner at public sale, without some previous arrangement to secure a purchaser, after having applied to several other persons

without success, appealed to J. I. Jacob to buy part of the land, or enough of it to pay the sum decreed to Hunter, at a fair price, Jacob agreed that he would pay $1,000 for the twenty and a half acres of land, provided, however, he could buy the whole of the land at the commissioner's sale for the amount due upon the decree to Hunter, to which Bainbridge, after consulting with Mrs. Simrall, assented, *believing it to be,* as he states, *the best arrangement that could be made under all the circumstances.* The sale did not take place at the time, as at first advertised, and afterwards Jacob receded from the proposition to give $1,000, and proposed to Bainbridge to give $800 for the whole of the land, and declared he would give that and no more. Bainbridge, on account of the great scarcity of specie, the difficulty of procuring it, and being convinced that he could not do better, agreed to this abatement of the sum to be paid for the whole land, and to take the $800 for it. The other terms of agreement continued as before, unchanged. The sale was again advertised by the commissioner, and the land actually sold at the time and place designated by printed notice, and John I. Jacob became the purchaser at the precise amount due upon the decree in favor of Hunter. It will be observed, that it appears by the commissioner's report that the sale was fair, open, and regular; that he endeavored by proclamation and inquiry at the sale to make the debt out of as small a part of the land as possible, but after inquiry and effort thus made no person was found who would pay the debt for less than the whole of the twenty and a half acres of land, and that Jacob, who made this offer to take the whole land and pay the debt, was the highest and best bidder at the sale.

The agreement between J. I. Jacob and Bainbridge amounts to this, and no more—Jacob agrees, upon the condition he can buy the whole of this land at the commissioner's sale, for the debt, interest, and costs due to Hunter, so as to be able, in consequence thereof, to get the title to the whole of the land by the com-

SIMRALL'S HEIRS
*vs.*
JACOB'S EXS. &C.

Where land was decreed to be sold, or so much thereof as would satisfy a lien, and by an arrangement between defendant's agent and

SIMRALL'S HEIRS
*vs.*
JACOB'S EXS. &c.

a third person it was agreed that the third person would bid the amount of the lien for the whole lot of land, and pay a specific sum to the defendant for the whole, and the commissioner made the sale without any knowledge of the agreement, or any fraud in the purchaser, and the land was bid off by the person who had agreed to buy at the amount of the decree, and the sale was reported, confirmed, and the land conveyed, and the excess of price agreed on above the lien paid to defendant.— Held, that there was nothing unfair or improper in the arrangement, and it was valid, and should not be disturbed after a lapse of twenty years and more.

missioner's deed, he would pay over and above the amount of the decree a sum sufficient to make the whole price of the land come to $800, to this Bainbridge agrees. Now this agreement might or might not take effect; for, if at the sale any person should offer to pay the debt for less than the whole quantity of the land, to-wit, for three-fourths or one-half of the twenty and a half acres, in such event, of course, the agreement would have failed, and Jacob be released from his promise to pay the $800.

It does not appear from the evidence in the cause, that the commissioner was in any wise informed of or controlled by this arrangement, or that it produced the slightest effect upon his own action, or the sale itself. It is not shown that Jacob fraudulently prevented others from bidding at the sale, or that by any improper or fraudulent conduct or conversation of his, that he suppressed competition, or that by reason of his agreement the sale was controlled or influenced in any way. It follows that Jacob might, had he made no such agreement, have purchased the whole of the land for $457 40½ instead of $800, so that he stands in the position of having gratuitously paid to Mrs. Simrall, the mother and guardian of the complainants, the sum of $342 60 more than he could have purchased the whole of the land for at the sale, as incontestibly proven by the results as ascertained by the actual sale itself, made by the commissioner, unless, indeed, it be made to appear that the commissioner was apprised of the agreement, and fraudulently brought about the result as reported by him, by hastily closing the sale upon the bid of Jacob, without affording an opportunity to others to make a bid more favorable for the interests of the heirs of Simrall, or by disregarding and rejecting such bid or bids, or that Jacob fraudulently prevented competition at the sale, by persuading others not to make any offers for the land on the ground that it was understood and arranged, by the parties interested, that he was to purchase it, or unless it appears that by some fault and fraud of

Jacob, he prevented a fair sale of the land.  But there is no proof, either circumstantial or positive, that tends in the slightest degree to falsify a single statement in the commissioner's report of the sale made by him.

Bainbridge proves that he had attempted to make some arrangment with Dr. Wilson, and with others, to buy the land, to prevent a sacrifice, but Wilson declined, because *"he did not have the money,"* and others declined *"because the great scarcity of money was in the way."* He proves that others besides Jacob attended the sale, but that they were few in number; that he informed Wilson, at the place and on the day of sale, that he had made an arrangement with Jacob, and that Wilson left the place, but he does not say that either he or Jacob requested or induced Wilson or any other person to depart or refrain from bidding, or that it was any part of the agreement with Jacob that competition should be prevented or suppressed, and the just inference is, that Wilson failed to continue at the sale, or to bid, for the same reason which caused him to refuse to make any arrangement, as proposed to him by Bainbridge, to-wit, that it being a cash sale, he had no money or not enough to buy the land, and pay the debt to Hunter.  Bainbridge says, that in making the arrangement with Jacob he thought he was serving Simrall's heirs, and that certainly there was no intentional fraud on his part, nor did he believe, at that time, that any fraud was intended on the part of Jacob.

It is not shown that the commissioner was informed by Jacob of the agreement, that he had knowledge of it, or that he or the sale was at all influenced or controlled by it, and in fact, Bainbridge proves that he did not inform the commissioner of the agreement with Jacob, and he cannot say that the commissioner's report is untrue in any particular, or that Jacob had any influence over his action in making the sale, or in making the report of the sale.  Until Hunter's debt was paid neither Bainbridge, Mrs. Sim-

rall, or Simrall's heirs had any right to sell the land, or to control the sale thereof. The sale made by Bainbridge, as Mrs. Simrall's agent, if it be called a sale, being made entirely without right, title, or authority of any kind, was a mere nullity, and could pass no right to the land either legal or equitable. The court, through its commissioner, could alone make the sale and pass the title to the purchaser, of the twenty and a half acres of land. John I. Jacob took nothing, and could not possibly gain any thing, by his contract with Bainbridge, unless the court's commissioner should, corruptly, in utter disregard of his duty, and in contempt of the court, whose decree he was required to execute in good faith, lend his aid and official authority to effectuate that arrangement. To presume that he did so, in the absence of any proof whatever of his knowledge of, or concurrence in that arrangement, would be unjust, unauthorized, and violative of that rule of law which requires and injoins a directly contrary presumption, to-wit, that the officers of a court have honestly discharged their duty, unless the contrary is made to appear by proof.

The fact that it so happened that Jacob did actually become the purchaser of the whole land for the debt due to Hunter, and costs, does not furnish such proof or authorize the presumption that the commissioner violated his duty, and that he was guilty of fraud; on the contrary, his report of his own regular, legal, and correct action, as reported by himself, must be taken as true, not only because the contrary is not shown by any evidence in the cause, but because it appears to be manifest from the testimony of Bainbridge that, on account of the great scarcity of a sound currency, and the consequent great depression of the price of real estate existing at the date of this sale, in February, 1825, had it not been for the arrangement made with Jacob, the whole of the land, would not have sold for more, but probably for less, than the debt, interest, and costs due to Hunter. The heirs of Simrall, therefore, were not injured, but, in

all likelihood, benefitted by the arrangement with Jacob, as the excess over the amount for which the land was actually sold was paid over to their guardian and parent; and if no such arrangement had been made it is not certain that the whole land would have commanded, in February, 1825, at public sale, a sum sufficient even to pay the debt of Hunter; and it is perfectly certain Bainbridge made the agreement with Jacob to prevent such injurious result to the interests of the heirs, and that Jacob did not intend or design to prejudice their rights or interests, and in fact acquired no power to do so by the agreement with Bainbridge.

To sustain their claim the complainants attorneys rely upon the opinion of this court pronounced in the case of *Wilson's heirs v. Wilson*, reported in 9 *B. Monroe*, 275. In that case seven of the heirs of Mary Wilson alleged in their bill that their land had been sacrificed, at a decretal sale, for a small sum—less than one-tenth of its value—in consequence, as they charge, of a fraudulent combination and arrangement between the adult heirs of their mother, the complainant Fleming, the purchaser Hicks, and *Newcomb* the commissioner, they make the commissioner a defendant, and pray that if the land, (which it seems had been sold by Hicks to an innocent purchaser without notice of the fraud,) cannot be restored to them, that they may have a decree against Newcomb the commissioner, with the other defendants, for the value of their interest in the land, &c.; they charged, as against Newcomb the commissioner, that through his co-operation with the other parties to the fraud, the sale itself was made subservient to effectuate their agreement, wherefore they insist that he, as well as the others, are responsible for the injury. The court say, in that opinion, that the commissioner's sale was used to pass the title to Hicks, and that Fleming the creditor, and Newcomb the commissioner, are exempted from responsibility, not upon the ground that they were ignorant of the arrangement, or that

SIMRALL'S HEIRS
*vs.*
JACOB'S EXS. &c.

they did not participate in it, but on the ground that they did not thereby derive any personal benefit or advantage, and the guilt of the commissioner was mitigated on the ground that he may have reasonably supposed that the excess for which the land was actually sold, over and above the amount falsely stated in his report, may have been applied to the payment of other debts against the estate of Mary Wilson, for payment of which the land could be thereafter subjected; and it seems manifest, from the whole tenor of that opinion, that the court assumed, as an established fact, that the commissioner knew of the agreement, and lent the aid of his office and his authority to carry it into effect. Whether the evidence contained in that record was sufficient to authorize such assumption or not, is not now the question; the court did assume, and believed, that the commissioner did, understandingly, co-operate with the other parties to the fraud to carry their scheme into execution, and excused him only because he may have believed that the excess paid by Hicks above the price reported as the sum for which the land sold, was necessary to pay other debts against the estate for which the land was liable, and because he did not share personally in the plunder of the infants. So there is a wide distinction between this case and the case of *Wilson v. Wilson,* because, in the latter, the design to defraud the infants was manifest and the scheme had undoubtedly that effect, through the intentional co-operation of the commissioner; in this case there was no such fraudulent design, and the agreement with Jacob was not known to or regarded by the commissioner, and the sale was not at all effected or controlled by it so far as appears from the evidence contained in this record.

The court had jurisdiction to order the sale; the sale was correctly and regularly made, under a decretal order, by a commissioner duly appointed for the purpose; the sale of the land, as reported, and the conveyance made to the purchaser, were both approved and confirmed by a final decree of the circuit

court, which stands unreversed.   After a lapse of
twenty-seven years a title, thus derived, and clothed
with such solemn sanction and high authority, ought
not to be disturbed, and the owner divested of his
right, unless upon grounds more solid, and upon evi-
dence more lucid than any which appears in this re-
cord.

Wherefore, the decree of the Louisville chancery
court is affirmed.

---

Since the court took a recess the term of office of
Chief Justice HISE expired, and the Hon. HENRY J.
STITES was elected a Judge of the Court of Appeals
from the 1st District, and took his seat.   Hon. THOS.
A. MARSHALL is Chief Justice.—*Rep*.